UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>CHRISTOPHER J. TERRY,<br>SSN: xxx-xx-9398,<br><br>Debtor. | Case No. 23-14957-JGR<br>Chapter 7 |
| WAYNE PRICE,<br>DEBORAH PRICE,<br><br>Plaintiffs.<br>v.<br><br>CHRISTOPHER J. TERRY,<br><br>Defendant. | Adv. Pro. No. 24-01026-JGR |

## OPINION AND ORDER

The vast majority of individual bankruptcy cases involve consumer debt and result in the discharge of those obligations without contest, furthering "[t]he principal purpose of the Bankruptcy Code . . . to grant a 'fresh start' to the 'honest but unfortunate debtor.'"[1] Other cases involve acrimonious creditor-debtor disputes accompanied by allegations of debtor misconduct and challenges to the discharge of debt. This is particularly true when the controversy concerns a failed construction project on a creditor's home.

In October 2021, Wayne and Deborah Price ("Prices") entered into a contract with Premier Consulting & Construction, Inc. ("PCC") for a kitchen and bath remodel. PCC is owned and controlled by the Debtor, Christopher J. Terry ("Terry"). Prior to the bankruptcy filing, on November 30, 2022, the Prices commenced litigation in state court against PCC and Terry, alleging breach of contract against PCC; unjust enrichment against PCC and Terry; violation of the Mechanics' Lien Trust Fund Statute—C.R.S. § 38-22-127 against PCC and Terry, specifically alleging $4,200.00 was paid for a glass shower enclosure; and civil theft—C.R.S. § 18-4-401 against PCC and Terry arising from

---

[1] *Kinney v. HSBC Bank USA, N.A. (In re Kinney)*, 5 F.4th 1136, 1145 (10th Cir. 2021) citing *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)).

the violation of the Mechanic's Lien Trust Fund Statute. The state court litigation was stayed against Terry when he filed his chapter 7 bankruptcy petition on October 27, 2023.

On January 31, 2024, the Prices filed their Complaint to Determine Debt and Dischargeability of Debt and Objection to Debtor's Discharge. The Complaint raised two claims for relief. The first claim for relief was for Violation of Mechanics' Lien Trust Fund Statute—C.R.S. § 38-22-127 accompanied by the conclusory statement: "Theft is non-dischargeable in a chapter 7 bankruptcy proceeding, and neither is fraud while acting in a fiduciary capacity. 11 U.S.C. § 523(A)(2)(a), (A)(4)." The second claim for relief was for Civil Theft—C.R.S. § 18-4-401. The only other reference to dischargeability claims was one additional conclusionary statement in the wherefore clause of the Complaint, requesting a determination that damages under the two claims for relief were excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), (4), and (6). The state court complaint was attached as an exhibit to the Complaint filed in the adversary proceeding.

On February 18, 2025, the parties filed a Joint Pretrial Statement and on February 25, 2025, the Court conducted a Final Pretrial Conference. A three-day, in-person trial on the Complaint was scheduled to commence on July 15, 2025. At Terry's request and due to the unavailability of Prices' counsel, the trial was continued to September 16, 2025.

In the Joint Pretrial Statement, the parties stipulated that Terry owns PCC. PCC contracted with the Prices to perform a construction project at the Prices' home. PCC paid subcontractors, including SG Framing, LLC, to perform the project. The project started in October 2021, and the last day PCC was on the project was in late December 2021. The project was unfinished when the Prices terminated PCC. PCC received $57,090 from the Prices for the project. PCC paid Terry $7,090 in connection with the project. PCC deposited funds from the Plaintiff for the project in a FirstBank account. PCC did not have an accountant tasked with accounting for the funds of the project. The scope of PCC's work was described in Terry's Response to Interrogatory Question 10. The Prices issued Check 1110 to PCC in the amount of $4,200 with the memo line "Shower Glass." The Prices did not receive a shower glass enclosure from PCC or its subcontractors. PCC did have other projects besides the subject project occurring at the same time. On September 12, 2022, the Prices sent a letter to PCC entitled, "Demand and Notice of Termination."

## FINDINGS OF FACT

An in-person trial was conducted on September 16, 2025. Wayne Price and Terry testified at the trial. In addition, Deborah Price briefly testified concerning the dates payments were made to PCC.

Pursuant to the Court's Fed.R.Bankr.P. 7016 Scheduling Order, the Prices disclosed 15 exhibits prior to trial. Admission of the following exhibits was stipulated:

1. Construction Agreement between the Prices and PCC, dated October 12, 2021;

2

2. Estimate Prepared by PCC dated October 8, 2021, Setting Forth the Scope of the Project;

3. Picture of Remodeled Shower Door Without a Glass Enclosure or Fixtures;

4. Invoice dated December 23, 2021 That Includes a Quoted Price of $4,200 for the Shower Glass;

5. Email Chain from March 8, 2022 through March 9, 2022 Between Terry and the Prices Concerning Remaining Items on a Punchlist and Installation of the Shower Door on March 11, 2022;

6. Email Chain dated February 11, 2022 Between the Prices and Terry;

7. Demand and Notice of Termination dated September 12, 2022, from the Prices' Attorney to PCC's Attorney and Terry;

8. Copies of PCC Checks to SG Framing from October 2021 through December 2021;

9. Check 1110 from the Price's to PCC in the Amount of $4,200 with a Notation on the Memo Line "Shower Glass";

13.  Check Number 116 dated September 6, 20222 from the Prices to CBSD LTD in the amount of $4,395.00 for "Shower Door Enclosure."

15. FirstBank PCC Bank Account Statements for the Period of September 2021 through April 2022.

Terry did not timely disclose lists of anticipated witnesses or proposed exhibits. Terry's evidence was limited to his testimony.

**Wayne Price's Testimony**

Wayne Price testified that he and his wife Deborah entered into a construction agreement with PCC in the approximate amount of $57,000 for remodeling work for their home.  Mr. Price referred to Exhibit 1, the Construction Agreement.

Mr. Price then testified as to the scope of the work performed by PCC under the Construction Agreement, referring to Exhibit 2.  He testified the demolition work was completed, the granite bar in the kitchen was completed but not done properly, an electrical water heater was installed but it was undersized and should have been a gas water heater.  He testified that other items were completed, but not to his satisfaction, pointing out problems with the front door replacement, steps in the garage, siding in the master bedroom, and unsatisfactory electrical work.  His main complaint was the failure

3

to complete the shower installation, referring to Exhibit 3, a photograph of the shower without the glass enclosure and shower fixtures.

He testified the Prices initially paid PCC $3,000 followed by a cashier's check of $20,000 for the deposit required under the Construction Agreement. In total, the Prices paid PCC $57,090, including a check in the amount of $4,200 on December 27, 2021, which specifically referenced the shower glass (Exhibit 9).

Mr. Price testified that most of the work on the project was performed by a person named Alfonso with SG Framing, the subcontractor hired by PCC. Initially, Terry was present at their home two to three times a week. The last day he was on the project was December 27, 2021.

Mr. Price was presented with Exhibit 8, Copies of PCC Checks to SG Framing from October 2021 through December 2021. Mr. Price was able to identify several checks that referenced "Price" on the memo line totaling $31,005.00. Mr. Price assumed that checks not referring to "Price" were paid in connection with other projects. The Court finds his testimony regarding the purpose of the checks was not based on personal knowledge and therefore speculative.

Mr. Price then reviewed Exhibit 15, consisting of copies of PCC bank statements from September 2021 through April 2022. Mr. Price was asked to identify expenses paid from the bank account that were unrelated to his project. Again, his conclusions were not based on personal knowledge and were speculative. Accordingly, the Court discounts the same.

Mr. Price testified that the Prices became frustrated with the quality of work and delays in progress. In December, a dispute arose over amounts being charged by an electrician. The Prices agreed to pay but made a notation in the memo line on the check that it was disputed. The Prices sent the check to PCC with a list of items that had not been completed satisfactorily. At the time, they were waiting for the shower enclosure to be delivered.

In January 2022, the Prices provided PCC a detailed list of items that needed to be completed to their satisfaction. The list identified a bathroom mirror, including framing; issues with the on-demand hot water heater; the installation of electrical box outlet covers; a custom cut-in for a barn door; end covers for a baseboard heater; issues with the door handle and ceiling of a storm door; loose electrical outlets in the kitchen; complaints about a transom window; the completion of the shower, and verification of hot and cold water; installation of missing glass enclosure and door; caulking completed around granite window ledges; returning the electrical breaker box in garage to preconstruction status; repair of drywall under a garage sink; and paste to cover styrofoam raw edge of faux logs.

In late March 2022, Alfonso of SG Framing came to the home supposedly to prepare for the installation of the shower glass and review the outstanding punch list issues. He was accompanied by his wife and their child. Mr. Price testified that he

4

refused entry because he did not believe it was appropriate or safe to allow Alfonso's wife and child to enter the home that he considered to be an active work site. He further testified that Alfonso stormed off when his wife was not allowed to enter the home.

By the summer of 2022, the work had still not been completed, and Mr. Price sought an estimate from another contractor to complete and correct the construction project. After a walkthrough, Mr. Price received Exhibit 12, an estimate from 4Sons Renovations LLC. The estimate in the total amount of $32,112.22 consisted of materials in the amount of $23,112.22 plus labor in the amount of $9,000.00. The materials included a "Plumbing package" of $9,339.00 and an "Electrical package" of $8,390.00 without detail. The estimate noted that the job bid assumed a breakfast bar would need to be completely redone, but if that was not the case, the bid amount would be credited back. The Prices did not hire 4Sons Renovations LLC to complete the project.

The shower door installation was eventually completed in September of 2022. Exhibit 13 was a check payable to CBSD LTD in the amount of $4,395.00 representing the cost.

On cross-examination by Terry, Mr. Price denied that he was aware that Alfonso's wife accompanied Alfonso to perform cleaning services in connection with the construction project. Mr. Price denied that Terry tried to reschedule the installation and review of the punch list. Mr. Price was questioned about his dispute regarding the additional charges for electrical work. In response, Mr. Price testified he felt it was unreasonable to include two trip charges resulting from a storm but tendered the check, noting the bill was disputed.

Mr. Price denied he was informed that the shower glass enclosure was received and ready for installation and stated he never saw the enclosure or related documentation.

On redirect examination, Mr. Price testified that the frustrations with the project continued to escalate and on February 1, 2022, a Certified Letter was sent to PCC demanding completion of the remaining punch list items and remitting a check in the amount of $480 representing the disputed electrical work payment. The Certified Letter was admitted in rebuttal as Exhibit 17.

Mr. Price testified that as a result of the disputes, he engaged legal counsel. Counsel was initially engaged in April 2022 and eventually prepared a Demand and Notice of Termination dated September 12, 2022, providing formal notice of termination; asserting construction defect claims; alleging trust fund violation and civil theft claims (limited to the $4,200 paid for a shower door/enclosure); and breach of contract claims (Exhibit 7).

The Court finds that Mr. Price's testimony was generally credible, although tainted by the animosity he holds for Terry as a result of the construction defects, failure to provide the glass shower enclosure, and related disputes. The Court also finds Mr.

5

Price's testimony regarding the March confrontation with Alfonso during his last visit vague and not particularly convincing.

While Mr. Price's testimony established construction defects, his testimony failed to elicit any evidence of unpaid subcontractors or suppliers. Mr. Price did not testify that any mechanics' liens were filed against the Prices' home or that any demands were received from unpaid subcontractors or suppliers.

His testimony and specifically Exhibits 9 and 13, established the Prices paid for the shower door enclosure which was not delivered or installed by PCC and that the Prices were required to pay a different contractor to complete the installation.

**Terry's Testimony**

The Prices called Terry as an adverse witness. Terry testified that he is the only owner of PCC and there are no other officers of PCC. Terry testified that he personally received $7,090.00 as profit from the project. Terry admitted that PCC, at the time, did not have an accountant engaged in connection with its construction projects and was not using a formal accounting system to track the various projects. Terry testified that he managed the accounts and tracked the payments made to SG Framing. Terry admitted PCC collected money for the shower glass enclosure and that the money was not returned to the Prices.

Terry was asked to refer to Exhibit 15, PCC's bank account statements. Terry admitted that PCC's receipts from various construction projects were held in a general account. Terry was asked to identify certain expenses paid from the account for insurance, financing costs and debt service, employee benefits including medical and dental expenses, and other business expenses. Terry admitted business expenses were routinely made from the PCC account but denied that payments from the Prices for their construction project were inappropriately used. Terry testified that some materials for the Prices project were purchased using credit card accounts. He testified that additional deposits into the account were made from other sources and may have included funds that he deposited into the account but could not recall exact amounts.

Exhibit 18, consisting of portions of Terry's response to Plaintiffs' first set of discovery requests, was admitted as an impeachment exhibit, and confirmed Terry paid himself $7,090.00 from the project; that PCC had no other employees; and that SG Framing was the primary subcontractor on the project.

Terry testified that payments were made to SG Framing for the Prices' project totaling $50,000.00 as reflected in the copies of the checks in Exhibit 8. When questioned as to why the checks payable to SG Framing referencing "Price" in the memo line only totaled $31,005.00, Terry testified that the notations to other projects on checks issued to SG Framing referred to drive-by inspections because those projects were located at higher elevations where construction work could not be performed in the winter months.

6

Despite not being referenced in the memo lines, he insisted the majority of the funds paid to SG Framing identified in Exhibit 8 were in fact for the Prices' project.

Terry testified that PCC maintained bank accounts at FirstBank and Evergreen National Bank. No evidence was received relating to the Evergreen National Bank account. Exhibit 15 consisted of bank account statements from September 2021 through April 2022 reflecting:

| Period | Deposits | Withdrawals | Net Cash Flow |
|---|---|---|---|
| September 2021 | $106,905.65 | $101,571.92 | $5,333.73 |
| October 2021 | $86,951.17 | $92,921.17 | -$5,970.00 |
| November 2021 | $70,470.00 | $60,576.04 | $9,893.96 |
| December 2021 | $106,652.65 | $75,030.23 | $31,622.42 |
| January 2022 | $104,755.00 | $144,190.10 | -$39,435.10 |
| February 2022 | $72,664.01 | $74,747.85 | -$2,083.84 |
| March 2022 | $56,874.95 | $48,262.26 | $8,612.69 |
| April 2022 | $105,557.16 | $114,612.83 | -$9,055.67 |
| **Total** | **$710,830.59** | **$711,912.40** | **-$1,081.81** |

Exhibit 16 was introduced and admitted as a summary of business expenses made from the account during the period from September 2021 through February 2022. The exhibit purports to identify general business expenses made from the account over the five-month period in the amount of $74,946.59. Testimony was sought from Terry attempting to establish that general business expenditures were made immediately following deposits received from the Prices, causing those funds to be diverted from the construction project. The line of questioning ignored cash flow from other sources and the fact that during the period from September 2021 through April 2022, PCC was operating on a neutral cash flow basis.

Importantly, during the period from October 2021 through December 2021, when the Prices paid PCC $57,090.00, deposits totaled $264,073.82 and reflected a positive net cash flow of $35,546.38.

Terry then testified on his own behalf. Referencing Exhibit 5, Terry indicated that PCC, through SG Framing, obtained the shower glass enclosure and returned to the project to install the same. Terry testified that efforts were made to gain access to the property to inspect the remaining items on the punch list through April and May 2022. Terry testified that the shower glass enclosure was installed by the third-party contractor prior to the termination of the contract on September 12, 2022 (Exhibit 7) and that PCC was not provided with an opportunity to complete the installation. Terry testified that the $4,200 was not returned because of ongoing settlement negotiations.

On cross-examination, Terry was presented with a Notice of Claim Pursuant to C.R.S. § 13-20-803.5 dated April 22, 2022, admitted in rebuttal as Exhibit 19. Terry denied receipt of the notice and pointed out a typographical error in his email address.

7

The Court found Terry's testimony to be convenient. His testimony that the checks written to SG Framing that did not reference the Prices' project were nevertheless attributable to the Prices' project strained credibility. On the other hand, his testimony that materials were often purchased using credit card accounts was unrefuted as no efforts were made in discovery by the Prices to obtain credit card statements. Further, Terry's examination did not reveal the existence of unpaid subcontractors or suppliers.

**Deborah Price's Testimony**

Mrs. Price was called to clarify the dates payments were made to PCC. On Terry's cross-examination, Mrs. Price denied having knowledge of any restocking fee paid by SG Framing in connection with the return of the glass shower enclosure and did not have any personal knowledge of the interaction between her husband and Alfonso in late March 2022 because she was at work.

**Wayne Price's Rebuttal Testimony**

Mr. Price was recalled to rebut Terry's testimony regarding termination of the project. He testified that he received an email from Terry sent on March 28, 2022, purporting to terminate the contract due to the refusal to admit Alfonso and his wife, who was there to provide cleaning services necessary to prep the area for the installation, and the failure to pay for electrical work. He testified that he never received a final statement for the project that was referenced in the email. The email was admitted as rebuttal Exhibit 20.

It is clear to the Court that as the project progressed and then stalled, the acrimony between the parties escalated. The last day Terry was present at the project was December 27, 2021. Numerous items were left uncompleted. By February 1, 2022, the Prices were demanding completion of the punch list items and alleging breach of contract (Exhibit 18). In late March 2022, Alfonso was denied access to the Prices' home, precipitating a claim by Terry and PCC that the Prices had breached the contract, justifying termination (Exhibit 20). In April 2022, the Prices engaged legal counsel in connection with the dispute and sent a construction defects demand to PCC (Exhibit 19). The testimony reflects that nominal efforts were made by Terry and PCC over the summer of 2022 to assess the project, but no corrections or completions were made. By September 2022, the Prices arranged for the installation of the glass shower enclosure through a different contractor (Exhibit 13) and, through their attorneys, provided a formal Demand and Notice of Termination (Exhibit 7). Eventually, the Prices commenced state court litigation against Terry and PCC.

## ANALYSIS

The Prices seek a determination that all funds paid to PCC in excess of payments made by checks to SG Framing (specifically referencing the Price project in the memo line) should be excepted from discharge in Terry's personal chapter 7 bankruptcy case. It was stipulated that PCC received $57,090 from the Prices for the project. The checks

8

paid to SG Framing identifying the Price project totaled $31,005. The Prices argue the difference, $26,085, was improperly used by Terry in violation of Colorado's Mechanics' Lien Trust Fund Statute, C.R.S. § 38-22-127, creating a nondischargeable claim.

The theory for recovery marks a stark pivot from the Prices' pre-bankruptcy demands. The Demand and Notice of Termination (Exhibit 7) and their state court complaint (Exhibit 1 to the Complaint filed in the Adversary Proceeding) both contain a demand for violation of the Colorado Mechanics' Lien Trust Fund Statute. However, the claim is limited to the $4,200 paid by the Prices for the glass shower enclosure that was not received. The balance of the claims asserted against PCC (and Terry) were based on breach of contract, construction defect, and unjust enrichment theories.

Once Terry's bankruptcy was filed, the Prices attempted to recast the contract dispute into one based on fraud, theft, and malicious injury.

### Dischargeability Under 11 U.S.C. § 523(a)

This Court has subject matter jurisdiction over this core matter to determine the dischargeability of a particular debt pursuant to 28 U.S.C. § 157(a) and (b)(2)(I).

The dischargeability of claims under 11 U.S.C. § 523(a) involves a two-part analysis. The first step requires "the bankruptcy court [to] determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016). The second step is a determination of whether the debt is excepted from discharge under the applicable section of 11 U.S.C. § 523(a). *Id.*

Terry did not dispute personal liability on the debt in the Joint Pretrial Statement or at trial. Accordingly, the debt is admitted, and the Court will address whether the debt is excepted from discharge.

The typical dischargeability contest involves a debtor allegedly wrongfully obtaining funds from a creditor. Claims arising under 11 U.S.C. § 523(a)(2)(A) involve funds obtained through false pretenses, a false representation, or actual fraud. Claims under 11 U.S.C. § 523(a)(4) involve funds obtained through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. Claims under 11 U.S.C. § 523(a)(6) arise from willful and malicious injury by the debtor to another entity or to the property of another entity.

The burden of proof for claims under 11 U.S.C. § 523 is a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). However, exceptions to discharge are narrowly construed. In furtherance of the fresh start objective of bankruptcy, doubts are resolved in favor of debtors. *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).

The Bankruptcy Code must be construed liberally in favor of debtors and against creditors. *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292-93 (10th Cir. 1997).

9

Nevertheless, the fresh start in bankruptcy is limited to unfortunate debtors who are nonetheless honest. *Grogan*, 498 U.S. at 287.

## 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides, in pertinent part, that a Chapter 7 debtor is not discharged from any debt for money or an extension of credit to the extent that such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Under 11 U.S.C. § 523(a)(2)(A), a debt obtained by false pretenses or a false representation is not dischargeable when a creditor proves:

> (1) the debtor made a false representation; (2) with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the false representation resulted in damages to the creditor.

*National Dev. Services v. Denbleyker (In re Denbleyker)*, 251 B.R. 891, 895 (Bankr. D. Colo. 2000) (citing *Field v. Mans*, 516 U.S. 59, 71 (1995)); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

"False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (B.A.P. 10th Cir. 2013)

The Complaint filed in the Adversary Proceeding is silent as to the elements of false pretenses or false representations. A claim under 11 U.S.C. § 523(a)(2)(A) is subject to the heightened pleading standards set forth in Fed.R.Civ.P. 9(b) as incorporated by Fed.R.Bankr.P. 7009. The Complaint fails to identify specific false representations or false pretenses, or when the false representations or pretenses were made. The Complaint fails to allege the false representations or pretenses were made with the intent to deceive the creditor. The Complaint fails to allege reliance upon the false representations or pretenses. No evidence was presented at trial to establish that false representations or pretenses were made by Terry with the intent to deceive the Prices or that the Prices justifiably relied on false representations or pretenses.

The Complaint also fails to allege actual fraud with specificity. "The term 'actual fraud' … encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016).

The Tenth Circuit Bankruptcy Appellate Panel stated that "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right,

10

that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (10th Cir. BAP 2013) (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).

Actual fraud is not limited to misrepresentations or misleading omissions. *Vickery*, 488 B.R. at 691 (citing *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000)). In order to except a debt based on actual fraud, the creditor must prove: (1) a fraud occurred; (2) the debtor intended to defraud; and (3) the fraud created the debt that is the subject of the dispute. *Pino v. Jensen (In re Jensen)*, No. AP 17-01078, 2019 WL 2403105, at *8 n.63 (10th Cir. BAP June 7, 2019) (quoting *In re Glenn*, 502 B.R. 516, 531 (Bankr. N.D. Ill. 2013), *aff'd sub nom. Sullivan v. Glenn*, 526 B.R. 731 (N.D. Ill. 2014), *aff'd,* 782 F.3d 378 (7th Cir. 2015)). The plaintiff need not establish reliance, because "reliance is relevant only when the fraud takes the form of a misrepresentation." *Vickery*, 488 B.R. at 690 (internal quotation marks and citation omitted).

The allegations in the Complaint and the evidence presented at trial fail to establish that Terry had a present intent to defraud the Prices. The Prices did not identify a claim for false premises, false representation, or actual fraud in the Joint Pretrial Statement or at trial. The Prices failed to prove the elements to establish a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

## U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that a Chapter 7 debtor is not discharged for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

"Embezzlement is 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' Larceny is 'the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner.'" *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (B.A.P. 10th Cir. 2015) (internal citations omitted).

The allegations in the Complaint and the evidence presented at trial fail to establish that Terry committed embezzlement or larceny. The Prices did not argue embezzlement or larceny at trial or in the Joint Pretrial Statement.

Instead, the Prices' case rests on the claim that Terry's acts constituted "fraud or defalcation while acting in a fiduciary capacity."

**Mechanics' Lien Trust Fund Statute**

Upon the filing of Terry's bankruptcy, the various theories for recovery asserted by the Prices in the adversary proceeding were recast as violations of the Mechanics' Lien Trust Fund Statute.

Prior to the Supreme Court's decision in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013), in the Tenth Circuit, to succeed on a claim for fraud or defalcation while acting in a fiduciary capacity, a creditor was required to prove: (1) the existence of an express or technical trust; (2) that Debtor owed a fiduciary duty arising from the trust; and (3) that Debtor breached the fiduciary duty by defalcation. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371-72 (10th Cir. 1996).

Whether a debtor is a fiduciary is determined by federal law, although state law is relevant to the inquiry. *Young*, 91 F.3d at 1371. In order to establish a fiduciary duty, a creditor must prove the existence of either an express or technical trust. *Id.*

The Prices rely on the Mechanics' Lien Trust Fund Statute to establish the existence of an express or technical trust. Colo.Rev.Stat. § 38-22-127(1) provides:

> All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

The Mechanics' Lien Trust Fund Statute satisfies the express or technical trust requirement and imposes a fiduciary duty necessary to establish a claim under 11 U.S.C. § 523(a)(4). *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 49 (Bankr. D. Colo. 2014).

Property owners, as well as subcontractors, material suppliers, and laborers, have standing to pursue violations of the Mechanics' Lien Trust Fund Statute. *Syfrett v. Pullen*, 209 P.3d 1167, 1171 (Colo. App. 2008).

The evidence presented at trial established that Terry controlled the finances of PCC, thereby extending personal liability to Terry for violations of the Mechanics' Lien Trust Fund Statute. *See Alexander Co. v. Packard*, 754 P.2d 780, 782 (Colo. App. 1998).

Prior to *Bullock*, the presentation of unpaid invoices from subcontractors or suppliers could establish the element of defalcation. Once a showing was made that funds received by the debtor were subject to the Mechanics' Lien Trust Fund Statute, the burden shifted to the debtor to "render an accounting to show that all contract disbursements on a particular project were used first to pay all subcontractors, material suppliers and laborers on that project, and not put to some other use." *Cupit*, 514 B.R. at 49. In the Tenth Circuit, all a creditor had to do to establish defalcation was to "show a debtor's failure to account for trust funds, or negligence in the debtor's handling of trust funds . . . ." *In re Yiannos*, 673 B.R. 453, 487 (Bankr. D. Colo. 2025).

The Prices argued that all funds paid under the contract were subject to the Mechanics' Lien Trust Fund Statute. With this assumption, they then argued the burden rested with Terry to account for all funds paid by the Prices under the contract and that any funds that could not be directly traced to the project constituted a violation of the Mechanics' Lien Trust Fund Statute.

The Mechanics' Lien Trust Fund Statute is not that broad. It does not impose a technical trust over all funds paid on a construction project. Rather, it imposes a trust upon funds received "for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property . . . ." C.R.S. § 38-22-127(1).

The Prices hold the burden of proof to establish what payments were subject to the Mechanics' Lien Trust Fund Statute. Simply stating that all funds not paid to a subcontractor or material supplier or laborer are held in trust fails to meet the burden.

Assuming the Prices could show funds were subject to the Mechanics' Lien Trust Fund Statute, they still need to establish that fraud or defalcation occurred. Under prior law, the failure to account may have been sufficient to establish defalcation under 11 U.S.C. § 523(a)(4).

*Bullock* changed the analysis. The Supreme Court held that "defalcation," within the meaning of 11 U.S.C. § 523(a)(4) requires proof of a culpable state of mind described as "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." 569 U.S. at 269.

In order to prevail on a claim for breach of fiduciary duty as a non-dischargeable debt, the creditor must establish by a preponderance of the evidence that: (1) a fiduciary relationship existed between the debtor and the creditor, (2) the debt owed to the creditor is attributable to fraud or defalcation committed by the debtor in the course of the fiduciary relationship and, (3) the debtor acted with a culpable state of mind. *Jantz v. Karch (In re Karch)*, 501 B.R. 403, 407 (Bankr. D. Colo. 2013).

The Prices identified the payment for the glass shower enclosure in the amount of $4,200. The other damages claimed by the Prices are itemized in the CDARA Notice List attached as Exhibit 1 to the Demand and Notice of Termination (Exhibit 7).

1. On Demand Hot water. The on-demand hot water does not work properly. It goes cold after a few mins.

2. The light switch and light fixture outlet covers for the log sided wall installed.

3. The custom cut-in for the barn door.

4. The end covers for the baseboard heater installed in the master bedroom are missing.

5. Back storm door handle to properly shut and seal the door from the inside.

6. Electrical outlets; loose in the kitchen, and incorrectly mounted in master bath.

7. Transom front door window, should at least be a double pane window.

8. Shower sealant (2) applications applied.

9. Glass shower enclosure installed.

10. Caulking around the granite window ledges and drywall repair.

11. Electrical breaker box, in the garage, needs to be straightened and put back to pre-construction condition.

12. There is a large drywall hole that was created by the electricians under the garage sink, patch and repair this area.

13. Paste to cover the Styrofoam raw edge of faux log siding.

14. Proper permits should be pulled for electrical and plumbing work as required. "On Demand Hot Water System" installation should have had a permit pulled.

15. Several credit/refunds now due: Ceiling light fixture never installed in bathroom, pebble stone tile product, molding around mirrors.

16. Finish/correct baseboard around bathroom vanity.

17. Fix/replace kitchen baseboard heat cover.

18. Kitchen granite, proper edges cut and polished finish.

19. Kitchen granite bar top needs proper supports installed. Should be level upon completion.

20. Mis-colored black bathroom grouting used randomly on brick veneer in kitchen. Remove and replace with proper color mortar.

The items identified in the CDARA Notice reflect alleged construction defects, not damages arising from unpaid subcontractors, material suppliers, or laborers subject to the Mechanics' Lien Trust Fund Statute. The construction defect damages are a claim for breach of contract and are not excepted from discharge under 11 U.S.C. § 523(a)(4).

The Prices established that of the money paid to PCC under the contract, a check for $4,200 was specifically earmarked for the purchase of the glass shower enclosure (Exhibit 9). The Prices also proved they paid an additional $4,395 to a different contractor to install the same glass shower enclosure (Exhibit 13).

The facts, established through the testimony and exhibits, evidence that PCC contracted for the purchase of the glass shower enclosure, but its delivery was delayed due to supply chain issues. Exhibit 5, an email exchange between Terry and the Prices shows the shower door enclosure was ready for delivery and that the parties were attempting to arrange for its installation and for a review of the punch list items towards the middle to the end of March 2022.

The testimony established that Alfonso from SG Framing, PCC's subcontractor, reported to the job site to prepare for the installation of the glass shower door enclosure, but that he was denied admittance to the project by Mr. Price. The testimony established that after this incident, PCC and Terry did not return to the project. Terry's testimony indicated the glass shower enclosure was returned to the manufacturer and admitted the refund, less a 20% restocking fee, was retained by PCC and Terry in light of the ongoing dispute and settlement negotiations.

The $4,200 payment does not fit neatly within the framework of the Mechanics' Trust Fund Statute. The evidence reflects the $4,200 payment was forwarded to the material supplier and that the glass shower door enclosure was either delivered, or attempts were made for its delivery, but when the glass shower enclosure was returned, those funds were not credited back to the Prices. The evidence also established that the Prices had to pay a substitute contractor $4,395 for the same installation, the exact harm the statute is designed to prevent.

Prior to *Bullock*, fiduciaries were charged with knowledge of their duties and of applicable law and that subjective intent to breach a fiduciary duty was irrelevant. *Antlers Roof-Truss & Bldg. Supply v. Storie (In re Storie)*, 216 B.R. 283, 287 (B.A.P. 10th Cir. 1997). The evidence presented at trial established that Terry was an experienced general contractor. Presumably, Terry, by virtue of his experience, would have knowledge of the Mechanics' Lien Trust Fund Statute or be charged with constructive knowledge. Post-*Bullock*, this is not enough. To establish defalcation, the creditor must prove subjective awareness of the fiduciary duty and of the risk his conduct would violate that duty. *Cupit* 514 B.R. at 51. The Prices did not elicit testimony regarding Terry's state of mind.

However, defalcation may be found where a debtor's conduct evidences a conscious disregard of the fiduciary duty inferred from the facts of a particular case. *Id.* Here, Terry collected the funds for the shower glass enclosure and after it was returned to the supplier, retained the refund. The conduct under the facts of the case establishes the $4,200 payment to PCC and Terry is excepted from discharge under 11 U.S.C. § 523(a)(4) in Terry's personal bankruptcy case.

## 11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that a Chapter 7 debtor is not discharged for willful and malicious injury by the debtor to another entity or the property of another entity. The creditor must establish that the conduct of the debtor was "willful and malicious" and caused an injury to an entity or the property of an entity.

Non-dischargeability under 11 U.S.C. § 523(a)(6) requires both a "willful injury" and a "malicious injury." *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("Without proof of *both*, an objection to discharge under that section must fail.").

The United States Supreme Court has held that the term "willful" requires proof of a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Tenth Circuit has held that "the term 'malicious' requires proof 'that the debtor either intend[ed] the resulting injury or intentionally [took] action that [was] substantially certain to cause injury.'" *Panalis*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

Ordinarily, breach of contract, even an intentional breach of contract, will not establish a non-dischargeability claim under § 523(a)(6). However, "where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)." *In re Gonzales*, 667 B.R. 357, 372 (Bankr. D.N.M. 2025).

**Civil Theft**

In addition to actual damages, the Prices seek to recover treble damages, attorney's fees and costs available under C.R.S. § 18-4-405.

The Mechanics' Lien Trust Fund Statute provides that a person who fails to pay funds held in trust for subcontractors, material suppliers, or laborers commits theft as defined in C.R.S. § 18-4-401. C.R.S. § 38-22-127(5).

This Court has held that the elements of theft under C.R.S. § 18-4-401 parallel the standards applied to determine whether an injury is willful and malicious. Taking another's valuable property knowingly and deliberately and intending the injury of depriving them of its use and benefit, which is certainly reasonably foreseeable, falls within the terms willful and malicious. A defendant liable for civil theft necessarily meets the requirements of willful and malicious injury to the property interest of a plaintiff for the purposes of dischargeability under 11 U.S.C. § 523(a)(6). *Trans-West, Inc. v. Mullins (In re Mullins)*, Nos. 16-13773-JGR, 16-01282-JGR, 2020 Bankr. LEXIS 2720, at *84-85 (Bankr. D. Colo. Sep. 30, 2020).

However, "[a] showing of a violation of the Trust Fund Statute is not sufficient to establish that the *crime* of theft has been committed." *Pritchard Concrete, Inc. v. Barnes (In re Barnes)*, 377 B.R. 289, 301 (Bankr. D. Colo. 2007).

> The Colorado Supreme Court has interpreted the placement of the Rights in Stolen Property Statute [C.R.S. § 18-4-405] in the Criminal Code as an expression of the legislature's intent that the criminal act of theft must be proved, using the elements of the crime as defined in the Criminal Code, in order for a victim to recover treble damages. *Itin v. Ungar,* 17 P.3d 129, 133-35 (Colo. 2000). In *Itin,* the court stated that, "the statute provides for a private civil remedy enabling the owner of stolen property to recover the property . . . and to recover treble damages . . . if the taker commits one of the following *criminal acts:* theft, robbery, or burglary." *Id.* at 133 (emphasis added). All of the statutory elements of theft must be proved in order for the victim to recover under the Rights in Stolen Property Statute. *Id.* at 134.

*Barnes*, 377 B.R. at 300. *See also ASCI Readi-Mix v. Gamboa (In re Gamboa)*, 400 B.R. 784, 793 (Bankr. D. Colo. 2008) (a violation of C.R.S. § 38-22-127 by itself does not lead to criminal liability; all of the elements of the theft statute to obtain a criminal conviction, including the requisite intent, must be proved).

Civil Theft under C.R.S. § 18-4-401(1)(a) requires "two culpable mental states": (1) that the defendant knowingly obtained control over the owner's property without authorization; and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of the property. *McNulty v. Palecki (In re Palecki)*, 667 B.R. 581, 623 (Bankr. D. Colo. 2025).

The evidence at trial established the Prices paid PCC $4,200 for the cost of the glass shower enclosure. The evidence established attempts were made to install the glass shower enclosure but PCC's subcontractor was not allowed access to the home. The evidence establishes the glass shower enclosure was returned to the manufacturer for a refund, less a restocking fee, and that the refund was retained by PCC in the midst of the ongoing contractual dispute.

The evidence did not prove that Terry acted with the requisite intent to knowingly obtain or exercise control over the property of the Prices without authorization, or by threat or deception, with the intent to permanently deprive the use or benefit of the thing of value. No evidence was presented at trial regarding Terry's state of mind.

The Prices failed to prove Civil Theft and failed to prove the elements of a non-dischargeable debt under 11 U.S.C. § 523(a)(6).

## CONCLUSION

The Prices failed to meet their burden of proof, by a preponderance of evidence, under the claims asserted under C.R.S. § 38-22-127 and C.R.S. § 18-4-401, as those claims may be excepted from discharge under 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6), with the exception of $4,200 paid for the glass

shower enclosure. The retention of the $4,200 by PCC and Terry constitutes defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

Judgment shall enter in favor of Wayne Price and Deborah Price and against Christopher J. Terry in the amount of $4,200 excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) plus prejudgment-interest at the current prime rate of 6.75% and post-judgment interest at the applicable federal judgment rate.

Judgment shall enter in favor of Christopher J. Terry and against Wayne Price and Deborah Price on all remaining claims.

Dated this 26th day of February, 2026.

BY THE COURT:

_____
Joseph G. Rosania, Jr.
United States Bankruptcy Judge